UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

L.G.B., a minor, individually and  :
By and through her parents,        :
CHRISTOPHER AND GINNY BOBBY,       :
                                   :
And                                :
                                   :
CHRISTOPHER AND GINNY BOBBY,       :
Individually and on behalf of      :
their daughter, L.G.B.,            : ACTION NO. 2:13CV714
                                   :
             Plaintiffs,           :
                                   :
v.                                 :
                                   :
SCHOOL BOARD OF THE CITY OF        :
NORFOLK,                           :
                                   :
             Defendant.            :

<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

This is an appeal of a decision by an Independent Hearing Officer ("IHO") confirming plans for educating Plaintiff, L.G.B., who is disabled by autism. Throughout the 2012-2013 school year, Defendant School Board of the City of Norfolk ("SBCN") and Plaintiffs L.G.B. and her parents (collectively "Plaintiffs"), attempted to accommodate L.G.B.'s special education needs through the programs at Blair Middle School. Despite their attempts, Blair proved inadequate for L.G.B.'s unique needs, and in a proposed individualized education program ("IEP") finally developed on June 13, 2013, SBCN recommended placement in a more restrictive regional public school program

1

for autistic students, provided by the Southeastern Cooperative Educational Programs ("SECEP").

Plaintiffs disagreed with the IEP's recommendation of a SECEP placement, and SBCN filed for Due Process to enforce the plan over their objections. After a five day evidentiary hearing, an IHO upheld SBCN's proposed placement and Plaintiffs filed this appeal under the Individuals with Disabilities Education Act ("IDEA" or the "Act"). 20 U.S.C. § 1415(i)(2). Specifically, they allege the IHO erred in finding: (1) SBCN proposed an appropriate placement for L.G.B. in the June 13, 2013 IEP, and (2) SBCN's proposed placement would confer an educational benefit. SBCN responds that the IEP confirmed by the IHO's decision is both procedurally sound and reasonably calculated to confer some educational benefit.

The matter is now before the Court on the parties' cross motions for summary judgment, (ECF Nos. 27 and 28), which were referred to the undersigned Magistrate Judge for a Report and Recommendation. After a review of the Administrative Record and briefing by both sides, the Court heard oral argument on May 2, 2014. For the reasons set forth in detail below, the undersigned recommends that SBCN's Motion for Summary Judgment be granted, the Plaintiffs' Motion for Summary Judgment be denied, and the decision of the IHO be affirmed.

## PROPOSED FINDINGS OF FACT

L.G.B. is a 13-year old girl with Autism Spectrum Disorder ("ASD"). She resides with her parents in Norfolk and is enrolled in the Norfolk public schools ("NPS"). As a school system receiving federal funds, NPS is responsible to ensure that L.G.B. receives a free and appropriate public education ("FAPE") under the Act. (Am. Compl., ECF No. 6, ¶¶ 6-8).

Throughout her later years in elementary school, L.G.B. received specially designed educational services under an individualized education program ("IEP") developed by her IEP team. (Syzkuc Testimony, ECF No. 17-9 at 21-23). In 2012 L.G.B. entered middle school. She was placed in the NPS Autism Inclusion Program, a special education program offered to her at Norfolk's Blair Middle School. (Syzkuc, ECF No. 17-9 at 20-25; ECF No. 17-10 at 14-20)[1].

The goal of the Autism Inclusion Program was to confer educational benefits on students with autism by allowing them to access the general education curriculum with guided instruction and socialization opportunities with nondisabled peers. It was administered by Allison Szykuc, a member of L.G.B.'s IEP team and a program specialist with NPS. (Szykuc, ECF No. 17-9 at 7, 16). Szykuc worked with L.G.B.'s fifth grade IEP team in order

---

[1] All references to individual witness testimony in the IHO hearing transcript will initially cite the witness' full name, with all subsequent citations to the last name only, as well as the corresponding docket number.

to plan for her transition to middle school. She testified during the administrative hearing that the team knew there would be issues with L.G.B.'s transition to middle school because of the change in setting and increased stressors. (Syzkuc, ECF No. 17-9 at 7-14). As a result, her team concluded that L.G.B. would require a one-on-one paraprofessional, in addition to a teacher/case manager. (Szykuc, ECF No. 17-10 at 16-18). The paraprofessional would stay with the student and assist her in navigating the hallways and other transitions. L.G.B.'s teacher/case manager was Jennifer Goodwin, and her paraprofessional, Kellea Medlen. Szykuc testified that the plan envisioned a gradual decrease in the restricted specialized education setting provided by the AIP to permit L.G.B. to move towards fulltime access to the general curriculum by November of her first year in middle school. (Syzkuc, ECF No. 17-9 at 17-18).

Despite the efforts of her IEP team, L.G.B. was not successful at Blair. Data collected between September 2012 and February 2013 demonstrated that she was unable to manage her behavior in the general education setting, resulting in a number of verbal and physical outbursts directed at students, teachers and other adults. The record includes extensive detail concerning L.G.B.'s behavioral difficulties, but it is sufficient at present to note (and her parents do not dispute)

4

that despite extensive efforts, L.G.B. was unable to consistently access the general curriculum through the AIP as a result of her behavioral difficulties, all of which were determined to be manifestations of her disability. (Complaint, ECF No. 6, ¶ 16). As a result, L.G.B. spent less and less time in the general education setting and more time in the special education setting. By November 2012, L.G.B. was spending less than 13% of her school day accessing the general curriculum at Blair. Between November and January her behavioral difficulties worsened. She received several suspensions for behavior-related problems, and when she was able to attend school, she spent little time in the general curriculum. (Jennifer Goodwin Test., ECF No. 17-1 at 3-4).

On February 22, 2013, L.G.B.'s IEP team met to address her behavior. As a result of this meeting the team agreed that L.G.B. needed a more restrictive setting to address and get control of her behavioral issues. It was agreed during this meeting to arrange for L.G.B. to receive services in a more restrictive setting at Blair with a two-to-one staff ratio and an abbreviated school day, working primarily on mastered-out tasks.[2] During this February meeting, Ms. Szykuc also discussed the continuum of services available to L.G.B. through NPS,

---

[2] Mastered-out tasks are essentially tasks the student has already mastered, intended to avoid the behaviors which her team had associated with demands on L.G.B. to perform more difficult work. (Arthur Gregory Jacob Test., ECF No. 18-6 at 9).

5

including specifically SECEP.  (Ginny Bobby Test., ECF No. 20-1 at 16).

SECEP is a regional public school which provides specialized educational services to public school students in eight school divisions of Southside Hampton Roads.  Its Autism Spectrum Program ("ASP") educates students with autism through services characterized by smaller class sizes, limited transitions, and a multilayered support system of specially-trained teachers and behavioral specialists. (Szykuc, ECF No. 18-1 at 6). Szykuc testified that she is the liaison between NPS and SECEP and she described the SECEP program to L.G.B.'s parents during the February 2013 IEP meeting. (G. Bobby, ECF No. 20-1 at 16). Also at the February meeting, the team discussed the various classrooms utilized by SECEP, and Szykuc explained that the Norfolk classrooms would likely not be suitable for L.G.B. as they served a different group of students with more limited verbal ability. (Szykuc, ECF No. 18-1 at 8).  During the meeting, the parent's advocate discussed SECEP's other classrooms, including Virginia Beach classrooms which she described as very different from those serving the Norfolk SECEP ASP population.  This exchange led to L.G.B.'s mother signing a release to begin the process of investigating SECEP as an alternative placement. (Release, ECF No. 11-2 at 5; G. Bobby, ECF No. 20-1 at 16, "I'm going to have to sign a release so that

they're going to – they'd be able to identify programs, programming possibilities for [L.G.B.] in Virginia Beach.").

After the February IEP meeting, L.G.B. returned to Blair in the more restrictive two-to-one setting until the end of March. During this time, Greg Jacob, Assistant Director for SECEP's Autism Spectrum Program, conducted an informal observation of L.G.B. at Blair. Jacob testified at the hearing before the IHO that his ordinary evaluation process would involve preparation of a written report and a presentation to the IEP team. He stated, however, that there was no written procedure outlined – only that the best practice would be to present a written recommendation at the IEP meeting. Instead, Jacob observed L.G.B. in her classroom and made a verbal recommendation to the school district. (Jacob, ECF No. 19-2 at 23). Jacob testified that he was unable to make a written recommendation because the parents had revoked consent for a second observation which would be necessary to determine a specific classroom assignment within SECEP. (Jacob, ECF No. 19-2 at 24).

The parents' revocation of consent occurred April 12, 2013. In a series of email messages, beginning under the subject heading "NO OBSERVATION PERMITTED," Mrs. Bobby emailed other members of the IEP team to request a copy of the release she had signed at the February 22, 2013 IEP meeting. In the course of requesting the document, she stated that if it was to be used to

permit a staff person or representative of SECEP to observe or evaluate her child for any reason, that she rescinded the authorization. She stated that she believed the release was only to permit a "SECEP programmatic survey of the type of services available." (Email, ECF No. 10-5 at 30).

Although he was unable to complete a second observation, SECEP Director Greg Jacob testified that he believed L.G.B. would benefit from the SECEP program. (Jacob, ECF No. 18-6 at 22). He also agreed that L.G.B.'s higher "social and communication skills" meant the classrooms in Norfolk would not be appropriate for her; however, he had identified a classroom in Portsmouth at the Churchland Middle School where he believed L.G.B. would fit. He reported on this classroom to NPS staff involved with L.G.B.'s IEP team. Thereafter, Szykuc and Melanie Grindstaff, an autism specialist with NPS, visited the classroom to evaluate its suitability as a placement for L.G.B. (Jacob, ECF No. 18-6 at 23-24).

Later, Mrs. Bobby spoke to Greg Jacob directly. Jacob confirmed that, prior to receiving word of her revocation of consent, he had already informally observed L.G.B. in her current placement. He described the placement he observed as one-to-one setting, restricted school day, working on mastered academic tasks with an increased reinforcement schedule. (Jacob Email, ECF No. 10-5 at 55; Jacob, ECF No. 18-6 at 9). In

8

recapping an earlier phone call between the two, Jacob wrote in an email to Mrs. Bobby that based on his initial informal observation, "the SECEP classrooms in Norfolk did not serve similar students, however, [he] did supervise classrooms in Portsmouth SECEP that did serve students who were similar to [L.G.B.]." (Jacob Email, ECF No. 10-5 at 55-56). Mrs. Bobby forwarded this email to her IEP team. Without addressing the availability of classes for L.G.B. at SECEP's Churchland facility, she simply reiterated her view that she had not authorized any observation, that the Norfolk classrooms would not suit L.G.B.'s needs, and that she had previously stated to Szykuc that "My husband and I did not wish to engage SECEP at all." (Bobby email, ECF No. 10-5 at 56).

In early May, after the emails revoking consent to a SECEP observation, L.G.B.'s parents demanded that L.G.B. be re-integrated back into the general education setting at Blair. (Goodwin ECF No. 17-3 at 11, 13-14). They believed that the Learning Lab had been intended to get control of behavior and that they would not have agreed to the restrictive placement as a long-term solution. As a result, her teachers and paraprofessional began trying to reintroduce L.G.B. to the general educational setting. Unfortunately, the attempt at reintegration led to even more aggressive behaviors which prevented L.G.B. from accessing the general curriculum.

Specifically, on May 6, L.G.B. bit her caseworker, Ms. Goodwin on the arm when Goodwin attempted to take her to the general education classroom. On May 8, 2013, L.G.B. had to be physically restrained after kicking a teacher in the stomach twice and attempting to throw a water bottle at another student. She also directed profanity at the principal, assistant principal and Ms. Goodwin. On May 14, 2013, L.G.B. had to be escorted from a restroom after cursing at another student. She also threw her shoes at Ms. Goodwin and her paraprofessional, Ms. Medlen. During one outburst she kicked Ms. Goodwin, tried to pull her hair and scratched Ms. Medlen under her right eye when Medlen tried to stop her from tearing posters from the wall. (Goodwin, ECF Nos. 17-3 at 18, 23-25; 17-4 at 5-9). All of these behaviors led the NPS members of the IEP team, as well as L.G.B.'s parents, to conclude that the AIP at Blair was inadequate to deliver the special education services necessary to permit L.G.B. to receive educational benefits.

On May 9, 2013, members of the IEP team, including L.G.B.'s parents, conducted a manifestation determination review ("MDR") in connection with the May 6 biting incident. The MDR process is required by the Act to include members of the IEP team. 20 U.S.C. § 1415(k)(1)(E). The MDR team, including the parents, determined the biting was a manifestation of L.G.B.'s disability and agreed that L.G.B. should remain in a restricted Learning

Lab at Blair and not attempt to re-integrate with the general curriculum until the annual review of her IEP. (MDR Doc., ECF No. 11-5 at 21-22). Similarly, on May 17, 2013, another MDR meeting was held concerning the May 14 outbursts. This MDR team also concluded these behaviors were manifestations of L.G.B.'s disability and agreed to defer annual review of her IEP until after a third-party observation was conducted by the Training and Technical Assistance Center ("T-TAC") at Old Dominion University. (MDR Doc., ECF No. 11-6 at 5-7).

During the May 9, 2013 MDR meeting, NPS Teacher Specialist Melanie Grindstaff again raised the issue of continuum of services, and L.G.B.'s mother asked about the special education settings at other schools and the functional level of the other students served there. Grindstaff stated that SECEP programs were available in other cities, and that L.G.B. could access the programs in those other classrooms. Specifically, she described the SECEP programs in Portsmouth and at the Churchland Middle School which had been identified by Jacob to the parents. She also talked about other options on the continuum, including a private day setting, and eventually home-based services. L.G.B.'s mother stated that she would like to learn about SECEP classrooms at Virginia Beach and Grindstaff again reported that she had visited the Churchland SECEP classroom. The parties also discussed another SECEP opportunity at the Renaissance Academy.

During this May 9 meeting, Szykuc stated that the parents would have to complete a SECEP packet to continue the observation process, but L.G.B.'s mother stated she was "not ready to do that," and again declined to permit any further observation of L.G.B. for purposes of facilitating a specific SECEP classroom placement. (MDR Minutes, ECF No. 11-5 at 21-22).

The T-TAC observation of L.G.B. occurred on June 3, 2013. The observation confirmed the team's earlier conclusion about L.G.B.'s educational needs. Specifically, the T-TAC representative who conducted the observation, Kelly Barrett, a Certified Behavioral Analyst, confirmed that L.G.B.'s behavior was preventing her from accessing the curriculum in the general education setting. The T-TAC observation concluded that L.G.B. would benefit from an environment with fewer transitions, more individual control over tasks, and a "dense level of reinforcement" provided by more specially trained educators. (Szykuc, ECF No. 18-2 at 26; Barrett email, ECF No. 11-7 at 11-12).

On June 13, 2013, the IEP team convened again to develop L.G.B.'s annual IEP. During this meeting the NPS members of the team proposed a SECEP observation followed by a placement in a SECEP classroom appropriate to L.G.B.'s needs and abilities. The team members' recommendation followed a discussion of the continuum of services, which would include both NPS autism

12

classrooms and SECEP classrooms. The team described that, unlike the AIP program at Blair, SECEP has additional layers of support to help L.G.B. get control of her behavior in order to better access the curriculum. In describing why SECEP was appropriate, Szykuc explained the specially trained staff, including Board Certified Behavior Analysts ("BCBA") who worked with the directors, principals and classroom teachers to provide the "dense" reinforcement necessary to control L.G.B.'s behavior. (Szykuc, ECF No. 17-6 at 24, 25). The NPS members unanimously endorsed a SECEP observation for classroom placement. L.G.B.'s parents were adamantly opposed, stating that "SECEP was not an option." They did not disagree with the recommendation that L.G.B. be programed for a more restrictive setting, what they described as "self-contained," but stated that they wanted that programming to occur at her middle school, Blair. (Szykuc, ECF No. 17-6 at 22). After discussion, the parents refused to permit a SECEP observation and stated that they would not agree to the IEP if it proposed a SECEP placement.

Notwithstanding the parents' position, on June 24, 2013, NPS filed a Notice of Proposed Action requesting a change in L.G.B.'s IEP to permit her to receive specially designed instruction in a more restrictive setting at SECEP. The IEP also included the continued services of a one-on-one

13

paraprofessional.   The   parents   declined   to   consent   and   NPS invoked the due process procedure.

At  the  due  process  hearing,  the  parents  did  not  make  any effort  to  show  that  L.G.B.'s  current  placement  at  Blair  would have  conferred  educational  benefit.  (ECF  Nos.  20-1  at  22;  19-4 at  17,  18).  Nor  did  they  contend  that  SECEP  was  unable  to  meet L.G.B.'s  needs  or  that  any  other  placement  would  be  a  more appropriate  setting  to  deliver  educational  services.    They introduced  no  expert  testimony  on  the  subject[3],  except  through cross-examination  of  the  NPS  witnesses.  Instead,  as  they  have  in this  appeal,  the  parents  opposed  the  City's  action  solely  by arguing  that  the  IEP  as  written  could  not  be  implemented  because it  failed  to  specify  which  SECEP  classroom  would  be  utilized  to deliver   educational   services.    They   also   assigned   other procedural  errors,  contending  that  they  had  been  prevented  from participating  in  the  development  of  the  IEP  by  being  denied access  to  information  about  the  proposed  SECEP  placement.  The IHO,  in  a  detailed  22-page  opinion,  concluded  that  the  IEP  was reasonably  calculated  to  confer  educational  benefit,  that  a placement  in  SECEP's  ASP  was  the  least  restrictive  environment, and  that  the  SBCN  could  implement  the  IEP  by  conducting  an

---

[3] L.G.B.'s father, Christopher Bobby, is a special education teacher who was accepted as an expert by the IHO, but his criticism of SECEP did not derive from his expertise or from an assessment of the services provided at SECEP.

observation for classroom placement.   (ECF No. 1-1 at 21-22).
The parents filed this appeal.

After considering the parents' arguments, and reviewing the
Administrative Record, giving "due weight" to the findings of
the IHO, the undersigned finds that the IEP adequately
identifies the specialized educational services necessary to
provide educational benefits to L.G.B. In addition, the parents'
claims that they have been denied information are contradicted
by the written record. Only the parents' continuing refusal to
permit a placement observation prevented the specific classroom
from being identified in the IEP.  Accordingly, as set forth in
detail below, this report recommends the Court affirm the
decision of the IHO.

## ANALYSIS

The IDEA requires public schools receiving federal funding
to provide every disabled child a free appropriate public
education ("FAPE") specially designed to meet his or her unique
needs.  20 U.S.C. § 1400(d)(1)(A).  A school fulfills this
obligation when it provides that child with "personalized
instruction with sufficient support services to permit the child
to benefit educationally from that instruction." Bd. of Educ. of
Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley,
458 U.S. 176, 203 (1982).  This is accomplished, at least in
part, by the creation of an IEP for each disabled child.  20

15

U.S.C. § 1414(d)(1)(A). An IEP is a written statement for each child that outlines her "then-current educational status, establish[es] annual goals, and detail[s] the special educational services and other aids that the child will be provided." A.K. ex rel. J.K. v. Alexandria City Sch. Bd., 484 F.3d 672, 675 (4th Cir. 2007). It also must be "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207.

"Importantly, the IDEA does not rely solely on the IEP requirement to achieve the goal of a FAPE; additionally, the IDEA provides a range of procedural safeguards to ensure parental participation in the process." Fitzgerald v. Fairfax Cnty. Sch. Bd., 556 F. Supp. 2d 543, 551 (E.D. Va. 2008). While Congress intended parents to be actively involved in decisions regarding their child's education, this involvement does not rise to the level of a "parental veto." See id. In other words, "the IDEA is designed to ensure parental participation in decisions regarding their disabled child, but it does not ordinarily require parental consent such that parents may usurp or otherwise hinder an LEA's authority to educate" disabled children. Id.

Moreover, an alleged procedural violation of the IDEA, without more, is insufficient to show a school failed to provide a child with FAPE. Rather, when procedural violations are

alleged, they "must actually interfere with the provision of a FAPE to that child." DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester Cnty., 309 F.3d 184, 190 (4th Cir. 2002).  If a procedural violation is found, the court must determine "whether [the procedural violation] resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA." M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 533 (4th Cir. 2002); see also A.K., 484 F.3d at 679 n.7 (procedural violations subject to harmless error standard).

A district court reviewing a state administrative decision under the IDEA may grant summary judgment on the administrative record.  See Hogan v. Fairfax Cnty. Sch. Bd., 645 F. Supp. 2d 554, 561 (E.D. Va. 2009); Fitzgerald, 556 F. Supp. 2d at 550. In reviewing the administrative decision, a district court engages in a modified de novo review, making an "independent decision based on a preponderance of the evidence … ." Doyle v. Arlington Cnty. Sch. Bd., 953 F.2d 100, 103 (4th Cir. 1991).  At the same time, however, the court must afford the administrative findings "due weight." Id.  As the district court lacks the opportunity to assess the credibility of the evidence presented at the hearing, the IHO's findings are "considered prima facie correct," and any deviation from them must be explained.  See Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. TH, 642 F.3d

478, 485 (4th Cir. 2011); see also M.M., 303 F.3d at 530-31. Additionally, the party challenging the administrative decision bears the burden of establishing that the administrative decision was erroneous. A.K., 484 F.3d at 679.

**I.  SBCN appropriately offered FAPE by specifying a SECEP placement option for L.G.B. in light of her specialized educational needs.**

In their first argument, Plaintiffs allege SBCN denied L.G.B. a FAPE by failing to specify which SECEP classroom would provide the special education services proposed. Relying almost entirely on A.K. ex rel. J.K. v. Alexandria City School Board, 484 F.3d 672 (4th Cir. 2007), Plaintiffs maintain that SBCN's proposed IEP is fatally defective because it does not specify the exact place where educational services would be delivered to L.G.B. (ECF No. 27 at 11). Additionally, they argue, L.G.B.'s parents "expressed doubt as to whether the propose[d] placement would be appropriate," and "under the A.K. standard, SBCN cannot have met its burden at the administrative hearing to prove that it provided FAPE through the proposed IEP." Id. at 12. This argument overstates the rule in A.K. and mischaracterizes the parents' position during the IEP process.

A.K., like this case, involved a challenge to the school district's proposed IEP placement. There, the student, who suffered from a nonverbal learning disability, Asperger's

Syndrome and obsessive compulsive disorder, was already attending a residential school in Massachusetts pursuant to a settlement agreement between the parents and the school system. A.K., 484 F.3d at 675-76. Unlike this case, A.K.'s parents "were very happy with A.K.'s progress" in his existing placement. Id. at 676. At an IEP team meeting conducted at the end of the school year, the school system recommended A.K. be removed from the residential school and placed in "an unspecified private day school" for the following year. Id. Though two schools were suggested as possibilities during development of the IEP, no specific location was identified in the resulting IEP or was otherwise discussed in detail at the meeting. Id. Nonetheless, the IEP issued, specifying that services would be delivered by "Level II - Private Day School placement."

During the summer - after the IEP issued - the school system sent out applications on A.K.'s behalf to five area private day schools. Of the five, two were unable to provide A.K. a FAPE "due to the complexity of his disabilities," and a third indicated a lack of space. Id. A.K.'s mother researched the remaining two schools, both of which believed they could offer an appropriate program. After visiting them both and consulting with experts familiar with A.K., however, the mother determined neither school capable to meet A.K.'s specialized needs. Id. at 677. Of relevance here, all of this investigation

19

took place after the IEP team had concluded that services would be delivered in an unidentified "Private Day School." Based on their investigation, the parents refused to consent to the IEP and sought continued reimbursement for the costs of A.K.'s private residential facility.

After a hearing officer denied the parents' claims at a due process hearing, the parents filed suit. The District Court agreed with the IHO, that A.K.'s IEP had properly described the type of services to be provided and its failure to specify which school would deliver them did not deprive A.K. of a FAPE. The parents appealed to the Fourth Circuit alleging that the IEP failed to offer FAPE and that they were denied notice before the IEP meetings that private day schools in their area would be considered. Id. at 678. Because it failed to identify any private school capable of providing the specialized services A.K. required, the Fourth Circuit held the IEP "was not reasonably calculated to enable A.K. to receive educational benefits." Id. at 681. While the parents agreed that "an appropriate private day school" could have provided the student a FAPE, the "IEP development process concluded without any significant discussion of whether such a school existed, or if it did, how it would be a satisfactory match for A.K." Id. Thus, "the parents were left to fend for themselves to determine whether any private day school in their area . . . would be a

satisfactory fit." Id. The Fourth Circuit wrote that where the parents "had tried in vain to find a local private day school that would meet A.K.'s specialized needs, the offer of an unspecified 'private day school' was essentially no offer at all." Id. at 682.

The Court qualified its holding, however, emphasizing that the opinion did "not hold . . . that a school district could never offer a FAPE without identifying a particular location at which the special education services are expected to be provided." Id. It was not necessary to frame the holding so broadly. Instead, the Court wrote, "in a case in which the parents express doubt concerning the existence of a particular school that can satisfactorily provide the level of services that the IEP describes, the IEP must identify such a school to offer a FAPE." Id.

Several factors distinguish A.K. from the facts here, but the most important is that L.G.B.'s IEP did specify a "school" which was capable of implementing the IEP. As the hearing officer found, after considering the parents' arguments, L.G.B.'s IEP identified SECEP, which the IHO concluded was a "school" with classrooms available that should be appropriate for L.G.B. (ECF No. 1-1 at 18). Giving due weight to the IHO's findings, and based on the undersigned's own review of the Administrative Record, this conclusion is supported by a

preponderance of the evidence and the parents have not met their burden to show that it was incorrect.

Although SECEP operates regionally, and staffs a number of classroom locations throughout Hampton Roads, its special education services are delivered by a centralized staff with consistent approaches to training and the delivery of services to students with autism. (Jacob, ECF No. 18-6 at 13-20). As a result, unlike in A.K., members of L.G.B.'s IEP team, including her parents, were able to speak to the SECEP program director, and others who were familiar with the services provided at SECEP. In addition, SECEP Program Director Jacob reviewed L.G.B.'s records and observed her in the restricted setting at Blair. Jacob concluded that she would benefit from classrooms at SECEP and identified a specific classroom, the Portsmouth classroom at Churchland Middle School, which he described to IEP team members, Szykuc, Grindstaff, and Mrs. Bobby. (Jacob, ECF No. 18-6 at 23-24; Jacob Email, ECF No. 10-5 at 55-56). As a result, there was no dispute about the type of services available at SECEP, their suitability to L.G.B.'s unique needs, and the school's ability to deliver them in a regionally accessible classroom. There is also no dispute that those services available at SECEP - small class sizes, limited transitions, and a robust level of reinforcement for behavioral issues - were identified as important special education services

by all of the members of the IEP team, as well as by the independent observation performed by T-TAC observer, Kelly Barrett.  Both Jacob and Szykuc described in detail the training of the staff that would be available to L.G.B. through SECEP.

Thus, unlike in A.K., L.G.B.'s parents knew months before the IEP was issued, through the designation of SECEP – the exact services to be provided, the quality of the staff who would be providing them, the educational model used to deliver these services, and the availability of a regionally accessible classroom where they would be provided.  In fact, the only information that was not available to the parents during the IEP process  was the exact location where these services would be delivered.  While this is an important factor in evaluating whether L.G.B.'s IEP delivered a FAPE, it is not dispositive. See A.K., 484 F.3d at 681; A.W. ex. rel. Wilson v. Fairfax Cnty. Sch. Bd., 372 F.3d 674, 682 (4th Cir. 2004). Moreover, the only reason that the SECEP classroom was unspecified, was the parents' adamant and continuing refusal to cooperate with the final step necessary for a classroom-specific placement.

A second important difference is that, unlike the parents in A.K., L.G.B.'s parents did not question SECEP's ability to meet their daughter's educational needs.  In total, the IHO heard testimony from at least seven educators familiar with both L.G.B. and the program at SECEP. (Jacob, ECF No. 18-6 at 21-23;

Szykuc, ECF No. 17-6 at 24-25; Grindstaff, ECF No. 18-4 at 12-14; Goodwin, ECF No. 17-6 at 23-25; Regina Owens-Guy, ECF No. 19-1 at 63-65; Leslie Tietze, ECF No. 19-1 at 43-46; Janice Denise James-Mitchell, ECF No. 19-2 at 5-8). Each one testified that the program would be a good fit for L.G.B., and capable of conferring educational benefit.   Against this evidence, the parents offered only their personal opposition.   In each case in which SECEP was discussed, the only real reason for opposing it was the parents' belief that L.G.B. should receive the same level of specialized services at her existing school.   The parents called no experts, and although Mr. Bobby was accepted as an expert by the IHO, he offered no expert criticism of the services at SECEP.   He did not dispute the program's ability to provide the restrictive setting, limited transition and dense level of behavioral reinforcement that every person on her IEP team concluded would be required for L.G.B.'s success.   Instead, when asked directly why he opposed a SECEP placement, Mr. Bobby testified that in his view, SECEP "has the reputation for being a dumping ground for students you don't want to work with," and "there is no exiting the program."   He also offered his view that SECEP was a place where "first year teachers went to get a job – get some experience, and then go to a regular school." (Christopher Bobby Test., ECF No. 19-4 at 14).

24

These quoted sentences represent the entirety of Mr. Bobby's critique. He offered no data nor even anecdotal evidence to support his criticism, which was completely contrary to the testimony of seven other professional educators. Contrary to his unsupported testimony, Jacob – the program director – testified that students at SECEP continued to be rigorously evaluated in the IEP process to determine whether their needs were being met in the least restrictive setting. Moreover, Jacob and others described one of the principal advantages of SECEP as its concentration of highly-trained special education professionals. This evidence is more than sufficient to sustain the IHO's finding that the IEP's designation of SECEP was reasonably calculated to confer educational benefit.

## II. The parents were not denied an opportunity to participate in developing L.G.B.'s IEP.

The parents also contend that the IHO erred by enforcing the IEP over their claim that they were excluded from the statutorily mandated IEP process. They argue that the failure of a SECEP representative to attend the IEP meeting, and "the fact that the parents were never given an opportunity to . . . hear from a SECEP representative, are clear evidence that L.G.B.'s parents were denied a real opportunity to participate in the IEP process." (ECF No. 30 at 5). In their brief and at

oral argument, parents' counsel has repeatedly contended that NPS officials withheld information and that they "should have allowed L.G.B.'s parents to have the same information as SBCN representatives" regarding the SECEP placement. (ECF No. 30 at 5).

These claims are flatly contradicted by the written and recorded records of the IEP process. As early as February 2013, four months before the June IEP meeting, L.G.B.'s team members discussed with the parents the continuum of services available to L.G.B., including specifically SECEP. Indeed, L.G.B.'s mother signed a release allowing NPS to begin investigating SECEP more fully as a possible placement option. While she later claims she was misled about the purpose of the release, the document she signed is exclusively for SECEP. It is impossible to understand as anything other than a SECEP release.[4] While the extent of the release may be ambiguous, there is no ambiguity in its purpose – to permit SECEP representatives access to L.G.B.'s present educational placement data.

Over the ensuing months, the record reveals a growing consensus among NPS staff that SECEP offered the best fit for L.G.B.'s specialized needs. On at least three occasions in February, May, and June 2013, the nature of SECEP and what it

---

[4] The single-page document has the SECEP logo and Administrative Office address at the top.  Immediately beneath the logo, in all capital, bold type are the words "CONSENT FOR RELEASE OF CONFIDENTIAL INFORMATION."

offered, as well as particular classroom locations within the program, were discussed with L.G.B.'s parents. While it is true that the parents opposed a SECEP placement, insisting instead that the same services offered by that program be developed at Blair, it is incorrect to say they were denied access to information about the SECEP program. Unlike A.K., L.G.B.'s parents were never left to "fend for themselves." See, e.g., Shaw v. Weast, 364 F. App'x 47, 53 (4th Cir. 2010). Despite their refusal to cooperate in the team's investigation of SECEP's resources, and indeed their active resistance to a SECEP placement, both parents had access to ample information about SECEP, its level of services, and even the specific classrooms most likely to meet L.G.B.'s needs. This information was reported formally to NPS members of the IEP team and informally to Mrs. Bobby on her inquiry by the director of the SECEP ASP Greg Jacob. Mr. Jacob communicated by phone with Mrs. Bobby and followed up his communication with an email in which he stated that he had informally evaluated L.G.B. and communicated verbally with NPS Special Education Official Fiesta Martin. He explained by phone and email that the SECEP classrooms in Norfolk did not serve similar students, however, Jacob did supervise classrooms in Portsmouth SECEP that did serve students similar to L.G.B. (Email, ECF No. 10-5 at 56).

Despite their acknowledged access to Greg Jacob and information about SECEP programs, Plaintiffs claim the failure to have a representative from SECEP attend the IEP meetings denied them their right to participate in the IEP process. (ECF No. 30 at 4) (citing 34 C.F.R. 300.325(a)(2)). There are several problems with this argument. First, Szykuc was the liaison between NPS and SECEP. She case-managed several other NPS students receiving services through SECEP and was very familiar with its programs. She was also a member of L.G.B.'s IEP team. (Szykuc, ECF No. 18-1 at 16-7). Thus, although she did not work for SECEP directly, she had access to ample information about the programs and local classrooms available. Secondly, SECEP is not a "private school or facility." It is a regional public program designed to assist the Southside Virginia school districts with educating special needs students. It was created by the school divisions under statutory authority granted by the General Assembly. Va. Code Ann. § 21.1-26. The cited federal regulation refers to private school placements – of the type proposed by the school system in A.K. By its plain language, the regulation does not apply to SECEP. Finally, even if the regulation did apply, attending a meeting is not mandatory, as long as NPS uses "other methods" to ensure participation. As set forth in detail above, SECEP's ASP director, Greg Jacob, observed L.G.B., spoke to her mother, and worked closely with

28

other members of the IEP team until he was prevented from doing so by the parents' revocation of consent.

Even if the failure to have a SECEP staff member attend an IEP meeting, or identify the exact classroom where services would be provided, could be construed as procedural violations, neither resulted in a denial of FAPE. The evidence was overwhelming, and uncontradicted, that SECEP's ASP could meet L.G.B.'s specialized needs. As defined by Szykuc, Goodwin, Grindstaff, and the independent T-TAC observer, Kelly Barrett, these included a smaller class size, fewer transitions, and a "thick" layer of reinforcement to get control of the behaviors that were preventing her from accessing the curriculum. At least seven educators testified that SECEP's program was capable of meeting these demands. No witness testified that it could not.

Jacob, the SECEP Director, testified at length regarding the importance of specially trained behavioral analysts in dealing with autistic children. He described in detail the number of such qualified professionals available to SECEP's ASP students. The Plaintiffs have cited nothing in the record to suggest that SECEP would not be able to meet these special needs. In fact, the only reason given for opposing SECEP is the statement by Mr. Bobby that the school was a "dumping ground" for difficult students. As set forth above, the Court gives

little weight to this subjective, and entirely unsupported criticism.

Finally, the only reason Jacob or another SECEP staff member did not attend an IEP meeting or participate more fully in developing the IEP was the parents' active opposition to SECEP placement which began more than two months before the IEP was finalized. At oral argument in this Court, the parents' counsel characterized their hostility to the SECEP placement as an accepted part of their right to participate in the IEP process, which NPS officials should be required to overcome with multiple due process proceedings. They contend the parents' "vehemence" in advocating for their daughter, by pressing every technical objection, is consistent with the statute's mandated procedural safeguards. This is incorrect.

The Fourth Circuit has held that the statute's requirement of parental participation does not give rise to a parental veto of the decisions of trained educators. A.W., 372 F.3d 674, 683 n.10 (4th Cir. 2004). This rule must apply with particular force when parents oppose placement without any pedagogical basis for doing so.

In fact, the parents' "vehemence" before the IHO and on appeal is reserved for their complaint that NPS failed to identify a classroom where services would be delivered. But the "touchstone" of the educational placement which the IEP must

30

primarily address "is not the location to which the student is assigned but rather the environment in which educational services are to be provided." Id. at 683. Here, that environment was well known to the parents and they have not disputed its appropriateness.  To be sure the eventual location where these services will be delivered is important.  The implementing regulations require L.G.B. to be educated "as close as possible to the child's home."  34 C.F.R. § 300.116(b)(3). But nothing in the record suggests she would not be.  The members of the IEP team had already identified multiple nearby classrooms and visited one at Churchland Middle School only 6.6 miles from Blair.[5]  The only reason one of these classrooms was not specifically identified was the desire on the part of SECEP staff to obtain the best possible fit by conducting an observation for the specific purpose of classroom selection.

This procedural defect – if it exists at all – arose exclusively from the parents' refusal to permit a second observation or otherwise cooperate in the development of L.G.B.'s IEP.  They have produced no evidence that a classroom in the SECEP ASP could not meet their daughter's needs – only evidence that they preferred her needs be met elsewhere.  But given the specialized staff, resources, and facilities already

---

[5] The 6.6 mile estimate was derived by the Court using Google Maps on May 28, 2014.  maps.google.com

31

in place at SECEP, and the availability of suitable classrooms nearby, the decision to specify a SECEP placement did not deny L.G.B. a FAPE.

## RECOMMENDATION

The IHO correctly determined that L.G.B.'s IEP was properly prepared, and reasonably calculated to confer some educational benefit. The undersigned likewise finds that any slight procedural defect in the failure to specify the specific classroom where such services would be provided did not deny L.G.B. a free and appropriate public education. Accordingly, the undersigned recommends that SBCN's Motion for Summary Judgment be GRANTED; the Plaintiffs' Motion for Summary Judgment be DENIED and the decision of the IHO be AFFIRMED.

## REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.    A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of the right to appeal from a judgment of this Court based on such findings and recommendations.   <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

May 30, 2014